**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

AUBREY COLE,

                Plaintiff,

      v.

NORTH AMERICAN BREWERIES,

                Defendant.

Case No.: 1:13-CV-236

Judge Michael R. Barrett

## OPINION AND ORDER

This matter is before the Court on Defendant North American Breweries' ("NAB") Motion for Summary Judgment. (Doc. 10). Plaintiff Aubrey Cole ("Cole") has filed a response in opposition (Doc. 14), and NAB has filed a reply (Doc. 17). This matter is now ripe for review.

## I.    FACTUAL BACKGROUND

This case involves claims of unequal pay due to gender discrimination, which are brought under Title VII, 42 U.S.C. § 2000(e), the Equal Pay Act, 29 U.S.C. § 206, et seq., and Ohio Revised Code § 4112.02, et. seq. The following is an overview of the relevant facts, as construed in the light most favorable to Cole.

### A.  Cole's Prior Background and Experience

From 1994 until 1999, Cole attended Indiana University concentrating on a major in telecommunications and a minor in political science. (Doc. 13-2, PageID 288). She, however, remains one credit short of graduation. (Id.).

From January 1994 through January 1999, while in college, Cole interned part-time as a personal assistant for John Mellancamp.  (Id., PageID 305).  As an intern, she developed video reels, coordinated television appearances, photo sessions, and interviews over the phone, and performed other scheduling, coordination, and clerical duties.  (Id., PageID 306).  During that same period of time, Cole also worked part-time as a college marketing representative for Sony Music.  (Id.).  In that position, she promoted music at a grass roots level by on-site visits to record stores, radio stations, and campuses, and by contacting newspapers to review the bands, among other things.  (Id., PageID 307-08).

In June 1999, Cole left college to take a job with Epic Records where she scheduled media appearances for the label's bands.  (Id., PageID 308).  She remained in that position until September 2002.  (Id., PageID 308-09).  Her ending salary was around $30,000.  (Id, PageID 309).

Cole next worked full-time as a personal assistant to Jack and Kelly Osborne.  (Id., PageID 310).  Her primary responsibility was to coordinate their daily schedules.  (Id.).  This job ended around July 2003, at which time Cole was making between $30,000 and $40,000 annually.  (Id, PageID 311).

Following a period of unemployment between July 2003 and May 2004, Cole started work as a junior manager for a Hollywood talent management agency where she made $35,000 to $40,000 annually.  (Id., PageID 311-12).  As a junior manager, Cole served as a liaison for musicians in regards to their scheduling, merchandising, and catering.  (Id.).

Next, Cole moved to a larger company where she served as a manager of college marketing and was making somewhere between $40,000 to $50,000 annually.  (Id., PageID 313).  Several months later she was promoted to a director where she oversaw MTV's campus

2

representative programs.  (Id., PageID 313-14).  She ended with a salary of approximately $55,000 to $60,000 per year.  (Id., PageID 313).

In May 2006, Cole moved to New York to work internally for MTV Networks as a grassroots marketing and campus representative for 35 schools nationwide.  (Id., PageID 314-15).  In that role, she made approximately $76,000 annually.  (Id., PageID 315).  After about a year in that role, Cole was laid off because MTV eliminated that program.  (Id.).  Thereafter, she went to cosmetology school with an interest in marketing beauty products.  (Id., PageID 316).  Following completion of cosmetology school, Cole saw an opening at Magic Hat for an entry-level sales job of "Drummer of Ales and Odd Notions" that had a starting salary of $28,500.  (Id., PageID 316-17).

**B.  Cole's Experience at Magic Hat and IUB**

In applying for the entry-level sales job at Magic Hat, Cole recognized that she had "[a]bsolutely no experience in the beer industry."  (Doc. 13-2, PageID 316).  Yet, she believed beer and music were closely related because they were products upon which consumers spent their disposable income.  (Id., PageID 317).  After submitting her application, Cole received an email for a job interview in Chicago.  (Id.).  After the interview, she was hired by Magic Hat.  (Id.).  She began her employment with Magic Hat in August 2008.  (Id.).

At the time she was hired, Magic Hat was an independent company.  (Id.).  After approximately three weeks on the job, Magic Hat acquired another company, Pyramid, and created Independent Brewers United ("IBU").  (Id.).  Cole's title at IBU was changed to "alebassador," but her sales role remained essentially the same.  (Id., PageID 317, 321).

In January 2010, Cole moved to Burlington, Vermont after receiving a promotion to "curator of curiosities" (i.e., a marketing manager) at IBU where she was working in the

marketing department.  (Id., PageID 317-18, 323).  Cole's salary was increased to $36,000 at that time.  (Id., PageID 321).  Her new job entailed training sales representatives, creating promotional and branding materials, public relations, and coordinating events.  (Id., PageID 323).

**C.  Cole's Hiring at NAB**

In or around August 2010, NAB acquired IBU.  (Doc. 10-1, PageID 138; Doc. 13-2, PageID 317, 323).  NAB was a brand new company that had been formed as a result of the merger between Anheuser-Busch and InBev USA.  (Doc. 13-1, PageID 253-54).

NAB purchased IBU primarily for the Magic Hat and Pyramid brands.  (Doc. 13-1, PageID 258).  Nevertheless, NAB interviewed IBU employees in an effort to hire any individuals who might be capable of filling available positions at NAB.  (Id.).  Although many IBU employees chose not to make the transition, Cole filled out an internal history document to express her interest in working for NAB.  (Doc. 13-2, PageID 324).  Cole was interviewed by NAB's Senior Vice President of Marketing, Peter Bodenham, for the position.  (Doc. 13-1, PageID 251; Doc. 13-2, PageID 324).  During that thirty-minute interview, Bodenham asked a lot of questions about Cole's position at IBU and was less interested in her personal and professional history.  (Doc. 13-1, PageID 259; Doc. 13-2, PageID 324).  On or around September 1, 2010, Cole was flown to Chicago where she went to the hotel, put her suitcase down, went to the boardroom, was handed a piece of paper by Bodenham, and was told she had five minutes to decide if she was going to take the position of Channel Marketing Manager ("CMM") that was offered to her by NAB.  (Doc. 10-1, PageID 140; Doc. 13-1, PageID 260; Doc. 13-2, PageID 325).  When Cole asked why her salary was remaining unchanged despite being offered a different job, she was told that everyone's salary was remaining the same as part of the

4

acquisition and that she had to come in and prove herself and that it would all be evened out eventually.   (Doc. 13-1, PageID 261; Doc. 13-2, PageID 324; Doc. 13-5, PageID 405). According to Bodenham, IBU's employees did not have the "same level of experience and the same level of knowledge that someone from an outside company such as Diageo or Pepsi would provide." (Doc. 13-1, PageID 262).  He believed, however, Cole had the potential to learn on the job and "stretch" into the role, and that IBU's personnel should be integrated into NAB's salary structure as relevant experience and skills developed.  (Doc. 13-1, PageID 258, 261-63).  After speaking with her husband, Cole accepted and moved to Buffalo, New York to begin her job at a salary of $35,984.00 with a recognition that she was in the 6A job band that had a midpoint salary of $98,000.  (Doc. 13-2, PageID 324-35).  Cole stayed in Buffalo for nearly a year.  (Id., PageID 325).  Due to the location of her region as well as other personal reasons, she moved to Cincinnati, Ohio where she continued to work in the CMM position.  (Id.).  Her CMM position covered Michigan, Ohio, Illinois, Wisconsin, Minnesota, and several southeastern territories. (Doc. 13-2, PageID 292, 300; Doc. 13-3, PageID 357; Doc. 13-6, PageID 421).

### D.  <u>Background on CMMs and the 6A Job Band at NAB</u>

At the time Cole joined NAB, its CMMs serviced three territories – the East region, the Central region, and the West region.  (Doc. 13-1, PageID 254-55).  The East region focused on the Labatt brand, had the heaviest volume with a 5.8 million case key performance indicator ("KPI") in or around 2011, and was the most competitive.  (Doc. 13-1, PageID 254; Doc. 13-3, PageID 355-56; Doc. 13-4, PageID 382; Doc. 13-7, PageID 461-62).  The Central region also focused on the Labatt brand in Ohio, Michigan, Illinois, Wisconsin, Minnesota, and several southeastern states, and had the second largest volume in or around 2011 (a 2.6 million case KPI in or around 2011).  (Doc. 10-2, PageID 226; Doc. 13-2, PageID 292, 300; Doc. 13-3, PageID

357; Doc. 13-4, PageID 382; Doc. 13-6, PageID 421; Doc. 13-7, PageID 461-62). The West region focused on small craft beer brands and was a relatively new territory with a volume near that of the Central region (around a 2 million case KPI in or around 2011). (Doc. 10-2, PageID 226; Doc. 13-4, PageID 382; Doc. 13-7, PageID 461-62). Although the responsibilities of the positions were similar, the different regions focused on different brands and the performance goals for the regions differed. (Doc. 10-2, PageID 226; Doc. 13-2, PageID 335; Doc. 13-4, PageID 380). However, the KPIs for the positions were essentially the same, although the Central and West regions were more comparable in terms of volume. (Doc. 13-1, PageID 267; Doc. 13-4, PageID 382).

The CMM positions fell within the 6A job band. (Doc. 10-1, PageID 140; 147-48; Doc. 13-1, PageID 264). The 6A job band has a midpoint salary of $98,000.00. (Doc. 10-1, PageID 140; 147-48; Doc. 13-1, PageID 264; Doc. 13-5, PageID 403). Per NAB records, the goal is to have the salaries of the employees in 6A job-band positions 20 percent below or above that midpoint. (Doc. 13-2, PageID 326). Those, however, are just "guideposts" for setting salaries. (Doc. 13-1, PageID 264-65; Doc. 13-5, PageID 403-04). Bodenham testified that relevant experience was the primary factor in setting CMMs' salaries. (Doc. 13-1, PageID 257; *see also* Doc. 13-5, PageID 405). According to Bodenham, the job-related experience that NAB valued was the consumer product experience, which included marketing experience in the beverage industry, marketing experience in the alcohol industry, channel marketing experience, experience with large-scale promotions, and experience working at marketing agencies. Doc. 13-1, PageID 255-57).

### E. Cole's Salary History and Maternity Leave at NAB

Once in the role of CMM at NAB, Cole's supervisor was Dave Grohusko. (Doc. 13-2, PageID 326; *see also* Doc. 10-1, PageID 147). Her starting salary was $35,984.00. (Doc. 10-1, PageID 147; Doc. 13-2, PageID 324-35). NAB's generally stated reasons for that starting salary are that Cole's background in entertainment was not applicable to fast-moving consumer packaged goods, she lacked relevant experience in programming and brand activation, and her lack of relevant experience meant she required more guidance, oversight, and "hand-holding." (Doc. 13-4, PageID 382; Doc. 13-5, PageID 404-05).

During her first review, Grohusko expressed shock at Cole's low salary. (Doc. 13-2, PageID 324-25; Doc. 13-4, PageID 379). He indicated that he would speak to Bodenham about the salary to get it to where it should be. (Doc. 13-2, PageID 324-25; Doc. 13-4, PageID 379). Normally, the range of salary increases is between 1 and 3 percent, with a maximum increase of 15 percent without CEO approval. (Doc. 13-1, PageID 265; Doc. 13-5, PageID 407). Effective January 3, 2011, Cole's salary was raised 20 percent, making her new annual base salary $43,200. (Doc. 10-1, PageID 147; Doc. 13-2, PageID 333). Around that same time, Robert Stauffer took over the role as Cole's supervisor. (Doc. 13-2, PageID 298).

As of July 4, 2011, Cole's annual base compensation increased an additional 30 percent, which made her new annual base salary $56,160. (Doc. 10-1, PageID 148; Doc. 13-2, PageID 333). Cole received approximately a 5 percent cost of living adjustment in or around October 2011 at which time her annual base salary increased to around $59,000. (Doc. 13-2, PageID 333).

On January 3, 2012, Cole received another salary increase of approximately 8 percent, which brought her annual base salary to $63,828. (Doc. 13-2, PageID 333). Cole received an

upward adjustment of approximately 2.35 percent on March 9, 2012, which raised her annual base salary to $65,328.  (Doc. 13-2, PageID 333).

In or around April 2012, Cole began a three-month maternity leave, at which time she still was supervised by Stauffer who reported to the vice president of sales, James Pendegraft.  (Doc. 13-2, PageID 295; Doc. 13-6, PageID 421, 427).  Just prior to her maternity leave, Stauffer informed Cole that he would understand and would not judge her if she did not return to work after having a baby.  (Doc. 13-2, PageID 346-47; Doc. 13-6, PageID 427).  He questioned whether Cole would be able to travel with a family and whether the job would "be too much for her."  (Doc. 13-2, PageID 346).

Cole returned from maternity leave in June 2012.  (Doc. 13-2, PageID 295-96).  Within twenty-four hours after her return, she received an email invitation for a phone conference with her previous boss Grohusko, her current boss Stauffer, the vice president of sales Pendegraft, and a human resources representative, Sheri Kiesow.  (Doc. 13-2, PageID 295-96).  During that phone call, Stauffer informed Cole that an outline had been put together detailing how she would do her job going forward.  (Doc. 13-2, PageID 296).  Pendegraft then informed Cole that "he thought that the way the role was currently set up . . . [should make Cole] feel subservient and . . . feel like [she] wasn't doing a very good job . . . ."  (Doc. 13-2, PageID 296).  Cole was given a four-page letter setting forth perceived gaps in her performance and detailing a series of actions that she was required to take within her first thirty days back at work.  (Doc. 10-1, PageID 143-46; Doc. 13-2, PageID 296).  Her failure to improve on and satisfy the outlined requirements within the timeframe allotted would result in discussions about "next steps, which could include disciplinary action up to and including termination."  (Doc. 10-1, PageID 146).  Cole was informed, however, that the outline was not a performance improvement plan.  (Doc. 13-2,

PageID 296; *see also* Doc. 13-6, PageID 428).  When asked why she was not previously made aware of any concerns with her performance, Stauffer informed Cole that he needed time to think about it and that it was not until she was absent that he realized he wanted things changed.  (Doc. 13-2, PageID 297, 301).  Cole believed he wanted the role to be performed in a different way based on prior conversations regarding her interactions with sales people in which she was described by Stauffer as being a "bitch" or being "bitchy."  (Doc. 13-2, PageID 297-98).  Cole, however, generally performed all of the requirements within the allotted timeframe.  (Doc. 13-6, PageID 434).

In February 2013, Cole voluntarily resigned from NAB to take a higher-paying position of $82,000 per year with an approximately $10,000 annual bonus in the beer industry with Warsteiner Importers Agency, Inc.  (Doc. 10-1, PageID 136; Doc. 13-2, PageID 291-92).  Goldman filled her role until NAB hired Scott Suppes to replace her.  (Doc. 13-3, PageID 356; Doc. 13-6, PageID 435).

### F.  Background of Salary of Other CMMs at NAB

Five CMMs at NAB are relevant here.  The background of each CMM is discussed below.

#### 1.  Brett Carlsen

Brett Carlsen was Cole's predecessor in the CMM position who was hired by Bodenham.  (Doc. 13-1, PageID 255, 257-58).  After earning a Bachelor's of Arts in History, Carlsen spent approximately three years as an assistant manager and then as a general manager of a restaurant chain.  (Doc. 17-1, PageID 518).  He next spent approximately three and a half years working as a production manager at a grocery distributor.  (Id.).  In or around February 2004, Carlsen took

the position as a marketing manager at that grocery distributor.  (Id.).  He remained in that position until December 2007.  (Id.).

Starting December 20, 2007, Carlsen transitioned into the role of a Customer Field Marketing Manager (equivalent of a CMM) at InBev, earning an annual salary of $73,000. (Doc. 13-1, PageID 255; Doc. 17-1, PageID 517).  Approximately 15 months later, Carlsen received a "merit increase" when NAB was formed, taking his salary to $77,380.  (Doc. 17-1, PageID 517).  Carlsen's last salary as a CMM in January 2011 was $86,864.  (Id.).

When Cole assumed the position, she had the same responsibilities, duties, and job description that Carlsen had when he was in the position.  (Doc. 13-1, PageID 261).  Like Carlsen, Cole oversaw the Central Region, which included Michigan and Ohio.  (Doc. 13-6, PageID 422).  Cole, however, also assumed an additional territory – the Southwest region.  (Doc. 13-6, PageID 422; Doc. 13-7, PageID 458-59).

### 2.  Scott Suppes

Suppes had completed three years of college courses towards an undergraduate degree in business administration.  (Doc. 17-1, PageID 527).  He also had attended a community college for two years, focusing on a degree in business.  (Id.).

Suppes had prior experience in the beverage industry before he became a CMM for NAB. (Doc. 17-1, PageID 527).  Specifically, he had six years of experience in sales for a wholesale beverage distributor, five years of experience as manager with Heineken USA, and eight years of sales experience with InBev/NAB.  (Doc. 17-1, PageID 517, 527).

On June 5, 2013, Suppes was internally promoted at NAB to the position of CMM where he replaced Cole after she voluntarily resigned.  (Doc. 13-6, PageID 435; Doc. 17-1, PageID 517).  He, however, was assigned to fewer territories than Cole.  (Doc. 13-3, PageID 357; Doc.

13-6, PageID 435).   His starting annual base salary in the CMM position was $107,905.20.
(Doc. 17-1, PageID 517).  His most recent salary in that position was $110,063.30.  (Doc. 17-1,
PageID 517).

### 3.  Matthew Goldman

Goldman has a Bachelor of Arts degree in History and a Masters degree in Social Science
from the University of Chicago.  (Doc. 10-1, PageID 150; Doc. 13-3, PageID 362).  He also
earned a certificate in Sports and Events Marketing from New York University.  (Doc. 10-1,
PageID 150; Doc. 13-3, PageID 362).

Prior to working for NAB, Goldman spent approximately six years working as an account
executive in Chicago, Illinois where he had served clients such as PepsiCo, Gatorade and
Tropicana in various marketing capacities.  (Doc. 10-1, PageID 149-50).  Thereafter, Goldman
also worked for several years as the Director of Retail Activation for Cenergy Communications
where he had developed, sold, and executed marketing programs for clients such as Aussie
Vineyards and High Falls Brewing.  (Doc. 10-1, PageID 149).  Goldman later joined InBev as a
Field Marketing Manager where he managed national brands and was supervised by Bodenham.
(Doc. 13-3, PageID 352).

Goldman became a Field Marketing Manager (otherwise known as a CMM) for NAB in
the East market in 2009 when InBev spun off Labatt and other brands that subsequently became
part of NAB.  (Doc. 13-1, PageID 262; Doc. 13-3, PageID 352).  Goldman's starting salary at
NAB was $89,250 and he was supervised initially by Grohusko and by several others thereafter.
(Doc. 13-3, PageID 359).  He received a 3.5 percent increase in January 2011 and a 3 percent
increase in January 2012.  (Doc. 10-2, PageID 171; Doc. 13-3, PageID 355).   From 2012
onward, his salary as a CMM was approximately $97,526.  (Doc. 10-2, PageID 171).

### 4.  Brittney Culver

In July 2008, Culver was hired by Pyramid Breweries as a part-time marketing intern while she still was in college.  (Doc. 17-1, PageID 519).  On February 23, 2009, Culver was hired as a Consumer Experience Coordinator for Pyramid/IBU at an annual base salary of $33,000.  (Doc. 17-1, PageID 522).

When NAB purchased IBU, Culver was hired as a CMM for the West region and was supervised by Grohusko.  (Doc. 13-4, PageID 375-76; Doc. 17-1, PageID 523).  As of September 1, 2010, her starting salary remained unchanged from her IBU salary.  (Doc. 17-1, PageID 523). Effective January 1, 2011, Culver's annual base salary was increased 20 percent to $39,600. (Doc. 17-1, PageID 526).

After Culver resigned in or about 2011, Cole took over the responsibility for the West region while still managing the Central region until NAB completed it search for a new employee to fill the position.  (Doc. 13-4, PageID 381).  On August 16, 2011, NAB offered the position to Matthew Cisneros.  (Doc. 13-7, PageID 468).

### 5.  Matthew Cisneros

Cisneros was hired by Grohusko for the position of CMM–West on or about August 16, 2011.  (Doc. 13-4, PageID 375; Doc. 13-7, PageID 468).  Upon his arrival at CMM, Cisneros had prior experience in the beverage industry.  From 2003 to 2006, Cisneros served as a sales representative at Southern Wine and Spirits managing relations with more than 100 key accounts in the Portland, Oregon market.  (Doc. 10-1, PageID 152; Doc. 10-2, PageID 217-18).  In 2006, he became the Regional Sales and Marketing Manager for Diageo in Portland, Oregon.  (Doc. 10-1, PageID 151; Doc. 10-2, PageID 215-16).  At Diageo, Cisneros earned the "Guinness World Record" for a Captain Morgan marketing promotion as well as the "Golden Bar" award

12

for the best national execution on the Crown Royal brand.  (Doc. 10-1, PageID 152).  Cisneros'
base salary at Diageo was approximately $81,000.  (Doc. 10-2, PageID 216).  Adding in his car
allowance and a 30 percent bonus, his total compensation package was approximately $115,000
annually.  (Doc. 10-2, PageID 216).  In 2011, Cisneros' position at Diageo was eliminated during
a corporate restructuring, at which time he joined NAB as a CMM.  (Doc. 10-1, PageID 216).

Cisneros requested and received a starting base annual salary of $90,000 to become
NAB's CMM-West, which at the time included 11 states.  (Doc. 10-1, PageID 218-19; Doc. 13-
7, PageID 468).  In the CMM-West position, Cisneros focused on small craft beer brands and
employed a different business model than the East and Central, although the responsibilities of
the positions were very similar.  (Doc. 10-2, PageID 226).  Cisneros KPIs for the position
included certain things that had to be completed within the year, quarterly or biannually, but he
generally had the freedom to structure those broad objectives.  (Doc. 10-2, PageID 220-23).
Cisneros currently makes $92,700.  (Doc. 17, PageID 500).

Cisneros has a Bachelor of Science degree in Advertising from the University of Oregon.
(Doc. 10-1, PageID 152).

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a
verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A
fact is "material" only if its resolution affects the outcome of the suit.  *Id.*

On summary judgment, a court must view the evidence and draw all reasonable
inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 249.  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.   <u>ANALYSIS</u>

NAB moves for summary judgment on all of Cole's claims.  Each of those claims is discussed below.

### A.  <u>The Equal Pay Act</u>

The Equal Pay Act ("EPA") prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work.  29 U.S.C. § 206(d)(1). To establish a prima facie case of wage discrimination under the EPA, the plaintiff must demonstrate that the employer paid employees of the opposite sex different wages for equal work or for jobs the performance of which requires equal skill, effort, and responsibility or are performed under similar working conditions.  *Foco v. Freudenberg-Nok Gen. P'shp*, 549 F. App'x 340, 244 (6th Cir. 2013) (citing *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006)).  "The two jobs need not be identical, but rather only 'substantially equal.'"  *Foco*, 549 F. App'x at 344 (citing *Beck-Wilson*, 441 F.3d at 359). "Whether jobs are substantially equal for

purposes of the EPA is determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'"  *Foco*, 549 F. App'x at 344 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)).  "Proving a violation of the EPA does not require proof of intent to discriminate."  *Foco*, 549 F. App'x at 344 (citing *Beck-Wilson*, 441 F.3d at 360).  However, not all differences in pay for equal work constitute violations of the EPA.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005), *abrogated on other grounds by Fox v. Vice*, 131 S. Ct. 2205 (2011).

If the plaintiff is able to establish a prime facie case under the EPA, the employer has an opportunity to prove that the pay differential is due to one or more of the four statutory affirmative defenses:  "'(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.'"  *Foco*, 549 F. App'x at 344 (quoting *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)).  Education and experience are factors other than sex that may justify a wage differential.  *Balmer*, 423 F.3d at 612.  "An employer is entitled to summary judgment on one of the affirmative defenses 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'"  *Foco*, 549 App'x at 344.  In other words, "'[t]he employer must prove that sex provides *no part* of the basis for the wage differential' in order to prevail on summary judgment."  *Balmer*, 423 F.3d at 612 (quoting *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997)).  That burden is a "heavy one."  *Timmer*, 104 F.3d at 843.

If the employer proves one of the affirmative defenses, then the plaintiff has the burden of production to demonstrate that the reasons for the pay differential are pretextual.  *Balmer*, 423 F.3d at 613.

### 1. Cole's prima facie case

Cole has made a sufficient showing of substantial similarity in the CMM positions to survive summary judgment.  Without question, Cole's job was substantially similar to her predecessor Carlsen's job as well as her successor Suppes' job.  Cole, Carlsen, and Suppes each were CMMs for the Central region.  In fact, Cole managed more territories than did Carlsen or Suppes.  NAB has not identified any significant differences in the positions that would preclude a finding of substantial similarity.

The record evidence construed in favor of Cole also creates a genuine issue of material fact as to whether her position was substantially similar to those of Cisneros and Goldman.  With respect to Cisneros' position in the West, Cole oversaw the West region, along with her own region, following Culver's resignation until the time Cisneros was hired.  Moreover, Bodenham testified that Cole could have filled and performed in the West CMM position, but she was not considered for the position because "she was from the east and wanted to stay in the east."  (Doc. 13-1, PageID 262).  Other facts supporting substantial similarity of the West and Central positions are the identical salary bands, similar volumes of sales, similar overall responsibilities, similar KPIs, and similar hours worked.  While the particular brands and goals of the regions may be different, a reasonable juror could conclude that the positions are substantially similar.

A reasonable jury likewise could conclude that Goldman's position in the East was substantially similar to Cole's position.  Goldman and Cole focused on the same brand, their KPIs were similar, their overall responsibilities were similar, their hours were similar, and their salary band was the same.  While record evidence shows that Goldman's market had a higher volume than the Central region, the evidence construed in favor of Cole does not plainly show

16

that the volume significantly altered the skill, effort, responsibilities or working conditions for the position.  *Foco v. Freudenberg-Nok Gen. P'shp*, 549 F. App'x 340, 244 (6th Cir. 2013) (citing *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006)).  Given that the two jobs need not be identical, the Court finds the evidence is sufficient to create a genuine issue of material fact.

### 2.  NAB's affirmative defense

As an affirmative defense, NAB contends that it set its salaries based on relevant experience, which includes experience in the alcohol and beverage industry, with channel marketing and large-scale promotions, and in working at marketing agencies.  In other words, it argues that employees with greater experience and more relevant experience were paid more than employees with less.

NAB is correct that education and experience are "factors other than sex" that may justify a wage differential.  *Balmer*, 423 F.3d at 612.  As explained previously, "[a]n employer is entitled to summary judgment on one of the affirmative defenses 'only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary.'" *Id.*  In other words, "'[t]he employer must prove that sex provides *no part* of the basis for the wage differential' in order to prevail on summary judgment."  *Balmer*, 423 F.3d at 612 (quoting *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997)).  That burden is a "heavy one."  *Timmer*, 104 F.3d at 843.

The record in this case shows that Goldman, Cisneros and Suppes each had significant experience specific to the beverage and alcohol industry.  While some of that experience was in sales rather than marketing, the differences between Cole and those three comparators appear to be significant enough to support some level of a wage differential.  *Foco*, 549 F. App'x at 346.

17

It is a closer call with respect to Carlsen, who NAB credits with five years of experience (fifteen months of beverage/alcohol specific marketing experience at InBev and approximately three years and ten months of experience as a marketing manager for a grocery distributor). In other words, NAB credits Carlsen's prior non-beverage experience in the grocery business because it claims that the experience provided Carlsen with channel experience. NAB argues that the experiential differences justified the significant discrepancies between the salaries of Cole and Carlsen, and that those experiential differences clearly show that sex provided no part of the basis for the salary discrepancies.

Construing the facts in favor of Cole, however, the Court finds that a rational jury could find that sex provides some part of the basis for the wage differential.[1] NAB's "experience-driven" salary model is rather amorphous. While generally the salaries increase with the number of years of experience with which NAB credits the individual, there is no defined policy that sets forth the experience valued or the weight to be given to the various types of experiences. In other words, there is a high level of subjectivity in setting the salaries of the CMMs. A comparison of the salaries for the CMM position in the below chart reflects that high level of subjectivity, as it shows significant inconsistencies in the salary discrepancies when the experience gaps between males and the experience gaps between males and females are compared.[2]

| Salaries Compared | Employee 1 | Employee 2 | Difference in Years of Experience | Difference in Salary |
|---|---|---|---|---|
| Starting Salaries | Suppes | Carlsen | 14 years | $30,525 |

---

[1] The discussion of the affirmative defense overlaps with the discussion of pretext. While the "experience" issue is discussed here primarily in relation to the affirmative defense, it also may be considered in relation to pretext.

[2] The chart utilizes the numbers provided by NAB in its chart in the reply memorandum (Doc. 17, PageID 498). It also identifies the female employees (i.e., Cole and Culver) using bold and underlined text.

| Starting Salaries | Suppes | Goldman | 10 years | $18,655 |
| Ending Salaries | Suppes | Cisneros | 9 years | $17,363 |
| Ending Salaries | Suppes | Goldman | 6 years | $12,537 |
| Ending Salaries | Cisneros | Carlsen | 4 years | $5,836 |
| Ending Salaries | Carlsen | **Culver** | 4 years | $47,264 |
| Starting Salaries | Cisneros | Carlsen | 3 years | $12,620 |
| Starting Salaries | Carlsen | **Cole** | Approx. 3 years | $41,380 |
| Starting Salaries | Carlsen | **Culver** | Approx. 3 years | $44, 380 |
| Ending Salaries | Goldman | Cisneros | 3 years | $4,826 |
| Ending Salaries | Carlsen | **Cole** | 2.5 years | $21,536 |
| Starting Salaries | Goldman | Cisneros | 1 year | -$750 |
| Starting Salary - Employee 1 to Ending Salary - Employee 2 | Carlsen | **Cole** | 0.5 years | $12,052 |

The largest experience gap between male CMMs that is reflected on the chart is 14 years. That 14-year experience gap between two male CMMs, however, results in a significantly smaller difference in salary ($30,525 difference) than a 3-year experience gap ($44,380 and $41,380 salary difference), and 4-year experience gap ($47,264 salary difference) between a male and a female CMM. Even comparing the salary differences between males and between males and females with the same gap in experience, there are significant discrepancies. For example, a 3-year difference in experience between two males yields salary discrepancies of $12,620 and $4,826, whereas a 3-year difference in experience between a male and a female yields salary discrepancies unfavorable to the female of $44,380 and $41,380. In fact, a 6-*month* difference in experience between a male and a female CMM yields a salary discrepancy that is comparable to

the salary discrepancy between males who have a *3-year* difference in experience.  At all levels, the largest discrepancies are between the salaries of a male and a female CMM.  Thus, the contrast in salaries between males and females with the same gap in experience is strikingly unequal such that a reasonable juror could find that sex played some part in the wage differentials.

In line with that amorphous and subjective salary model, NAB credited various individuals for their prior sales and marketing experience and credited Carlsen for prior years of non-beverage and non-alcohol specific experience while not crediting Cole for any of her prior non-beverage and non-alcohol specific sales or marketing experience, claiming that her prior experience is completely irrelevant. Interestingly though, NAB takes that position only in hindsight, as the evidence construed in favor of Cole indicates that NAB did not vet Cole's prior experience before hiring her as it did with the male employees, and that it never pointed to her inexperience as the reason for the salary discrepancies despite her multiple attempts to discuss the issue with NAB.  A jury reasonably could view that failure to vet Cole's experience as inconsistent with NAB's position that experience matters.

Of additional relevance is the evidence that Cole's starting salary was the exact same as the salary she received in her prior position.  From that evidence and the other evidence discussed above, a reasonable jury could infer that NAB considered only Cole's prior salary at Magic Hat/IBU in setting her salary significantly below that of the male comparators.  Such use of a prior salary to set a new salary and to justify a pay disparity is improper.  *Balmer*, 423 F.3d at 612 ("Consideration of a new employee's prior salary is allowed as long as the employer does not rely solely on prior salary to justify a pay disparity."); *see also Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (holding that "prior salary alone cannot justify pay disparity under the

EPA" and noting that "if prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated")  (internal citations and quotations omitted).  While NAB claims it is not fair to increase Cole's salary just because NAB bought out her prior employer, that argument ignores the fact that NAB *hired* Cole for that particular position at NAB.

In that same vein, the evidence that Cole received a high percentage of salary increases may diminish but does not necessarily negate any type of inference of gender discrimination as it relates to the base salary. A reasonable jury may question why the higher-percentage increases were even necessary. The jury may view that evidence as support for Cole's position that her experience was not considered in setting her salary or may view the increases as a means of masking unequal pay.  Such a view would seem to be supported by the testimony of Grohusko that Cole had a salary that was "shockingly low."  (Doc. 13-4, PageID 379).   Further, if the increases were to be justified by Cole's performance, then the critiques of Cole's performance and the identification of her purported performance deficiencies (*see* Doc. 13-5, PageID 406) may be viewed as insincere.[3]

In regards to cases upon which NAB relies to support its position that its business judgment cannot be questioned, the Court finds those cases distinguishable.  In *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 319 (6th Cir. 2013), the circuit court determined the employer did not act discriminatorily where it used an objective standard of evaluation that provided a non-arbitrary metric for evaluating experience.  As explained above, that is not the case here and there is not a non-arbitrary metric of experience upon which to base a determination that NAB plainly did not consider sex as a factor in setting the CMMs' salaries.

---

[3] Although education could account for some discrepancy, Cole and Carlsen may be viewed as roughly equivalent in that respect.

Also distinguishable is *Rowan v. Lockheed Martin Energy Systems*, 360 F.3d 544, 550 (6th Cir. 2004), in which the circuit court found that there was "overwhelming evidence" that the decision to discharge the plaintiff was not a pretext for age-based discrimination, including evidence that a 44-year old comparator who was not discharged had longer company service, more time in the position, and had plainly been responsible for more sophisticated work, as well as evidence that the plaintiff's position was being eliminated, that he received lower evaluations than his comparators, and that he plainly did less complex work. As explained both above and below, the Court does not find the evidence to be "overwhelmingly" supportive of NAB's position in this case.

As for *E.E.O.C. v. J.C. Penney Co.*, 843 F.2d 249, 253-54 (6th Cir. 1988), the court held that employer justified its adoption of a fringe benefit plan that disparately impacted one sex with the legitimate business reason of providing the greatest benefits for those who need coverage. It reasoned that even though the impact was statistically correlated to sex, that correlation did not make the plan discriminatory. *Id.* That decision, however, does not strongly support the affirmative defense here because this not a case where the employer adopted a clear standard that applied equally to all CMMs with a disparate impact on females; instead, this is a case of a purportedly subjective salary model under which the only two females are paid significantly less than the males.[4]

---

[4] Other cases cited by NAB also are distinguishable. Unlike here, *Mallison v. Haworth, Inc.*, 488 F. App'x 88 92-93 (6th Cir. 2012), involved a clear policy setting forth the factors considered, a clear pay grading system, and the posting of the position with such information and the anticipated salary prior to the position being filled. *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103 (6th Cir. 2006), also is distinguishable on its facts because the court found the testimony as to the factors considered to be consistent, and found the attempts to discredit that testimony unpersuasive while also taking into consideration evidence that there were males in the same position who were paid less than the females, there were significant experience and educational discrepancies between the female and the males who were paid more than the females, and there was clear evidence that some of the salaries paid to the male employees resulted from negotiations and reflected the amount necessary to recruit those employees from their prior positions. Moreover, there was a clear merit system that was organized and structured for pay increases. *Id.* As for *Balmer v. HCA, Inc.*, 423 F.3d 606, 613 (6th Cir. 2005), the court found in favor of the employer's affirmative

Accordingly, the Court finds that NAB has not met the heavy burden of proving its affirmative defense at this stage of the litigation, and summary judgment will not be granted.

### 3. Cole's pretext showing

Even if NAB satisfied its burden of proving its affirmative defense, the Court would find genuine issues of material fact preclude summary judgment on the issue of pretext. Much of the same evidence that the Court found to preclude a finding that sex played no role in the pay disparity between Cole and the male CMMs also prevents summary judgment on the issue of pretext.  As explained previously, the discrepancies in the way Cole was vetted for the position, the use of her prior salary as her starting salary at NAB, and the inconsistent gaps in pay between experience levels of males and experience levels of males and females all may be viewed as evidence of pretext.  Additional evidence of pretext is evidence that the goal for the 6A band is to have individuals in those positions paid within a 20 percent of the mid-point salary.  While the evidence shows that to be a guideline, the evidence also shows that the only CMMs within the 6A band that were significantly below the 20 percent threshold were the only two female CMMs.

While perhaps weighing less heavily on a finding of pretext, Cole also has presented evidence as to a change in treatment between when she left for maternity leave and when she returned from maternity leave, which could be suggestive of a sex-based bias.  In particular, she presented evidence that despite no prior problems raised about her performance (and significant

---

defense where there was evidence that the male asked for a higher salary than the female, had a higher salary history than the female and had what was determined to be more relevant industry experience than the female; here, however, there is not clear evidence that Carlsen asked for a higher salary or that NAB specifically compared Cole's prior experience and salary history to determine whether she had more or less relevant experience than Carlsen or other CMMs.  The same is true for *Bahner v. Aelita Software Corp.*, No. C2-04-848, 2005 U.S. Dist. LEXIS 4291 (S.D. Ohio Sept. 30, 2005).  *Lacey v. Robertson*, No. 00-1424, 2000 U.S. App. LEXIS 15427, at *2-3 (6th Cir. June 21, 2000), also does not persuade the Court that NAB established its affirmative defense, as the *Lacey* plaintiff was proceeding pro se, the appeal brief upon which the decision was based was difficult to decipher, the circuit court considered whether the plaintiff in the disparate treatment case was similarly situated with other counselors who received higher salaries, and the circuit court found nothing more than a contention that his experience should have been weighed more heavily than the education and experience of his co-workers; that is not the case here, as the argument goes beyond a mere contention that Cole's prior experience should have been given more weight.

raises in her salary), her supervisor, as well as other supervisors, managers, or executives at NAB, discussed "her performance" while she was on maternity leave and decided to impose stringent requirements on her the day she returned from maternity leave, which, if not complied with, could result in termination.  She also presented evidence as to comments about her maternity leave as well as her plans and ability to continue working after maternity leave. Although the connection to her salary does not appear to be direct, that evidence combined with the additional evidence suggestive of unequal treatment are sufficient to raise triable issues of fact.

### B.  Title VII

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation . . . because of such individual's . . . sex . . . ." *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 319-20 (6th Cir. 2013) (citing 42 U.S.C § 2000e-2(a)).  Title VII claims are analyzed under the familiar *McDonnell Douglas* framework.  Title VII claims of wage discrimination parallel those for violations of the EPA insofar as it incorporates the EPA's affirmative defenses.  *Beck-Wildson*, 441 F.3d at 369.  That means that if the employer satisfies one of the EPA's affirmative defenses, it also will be entitled to judgment on a Title VII wage-discrimination claim.  *Foco*, 549 F. App'x at 345 (citing *Beck-Wilson*, 441 F.3d at 369). However, claims for "sex-based wage discrimination can be brought under Title VII even though no member of the opposite sex holds an equal but higher paying job."  *Murphy*, 549 F. App'x at 320.

Given that NAB's argument as to the Title VII claim is premised on the same arguments as the EPA claim, the same analysis applies here.  Accordingly, there remain triable issues of fact on the Title VII claim.

*C.* **Ohio Rev. Code § 4114.02, et seq.**

Sex discrimination claims under the Ohio statute are analyzed under the same framework as the federal claims.  *McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461, 464 (6th Cir. 2013 (citing *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012).  Accordingly, for the same reasons set forth with respect to the Title VII claim, there remain triable issues of fact on the state law claim.

## IV.    **CONCLUSION**

For the foregoing reasons, NAB's motion for summary judgment (Doc. 10) is **DENIED**. The case shall proceed as scheduled.

     **IT IS SO ORDERED.**

s/Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court

25